FILED

2018 Jan-31 PM 03:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION
Case No. 7:17-cv-1961-LSC

MARIAN SNOW,
　　　Plaintiff,

　　　vs.

GENERAL ELECTRIC COMPANY, *et al.*
　　　Defendants.

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS DELL, INC., DELL TECHNOLOGIES, INC., AND DELL EMC'S MOTION TO DISMISS

---

Plaintiff MARIAN SNOW serves this Plaintiff's Response in Opposition ["PROD"] to Defendants DELL, INC., DELL TECHNOLOGIES, INC., AND DELL EMC's (collectively "DELL") Motion to Dismiss ("MTD"). [D.E. 26] DELL's MTD should be denied as DELL's arguments are meritless.

Plaintiff will herein show that DELL's baseless assertions fail, as they wholly rely upon speculation and inference. Plaintiff's PROD shows herein: 1) this this court does indeed have personal jurisdiction over DELL; 2) venue is proper in this the Northern District of Alabama; and 3) Plaintiff's First Amended Complaint ("FAC") does indeed allege facts connecting GE to the text messages sent to her. Plaintiff complied with Fed. R. Civ. P. 8(a)(2) "by giving a short and plain statement" of her claim(s) and clearly alleged sufficient facts to support her claims. Plaintiff's FAC properly alleges DELL was connected to the subject text messages

she received ("Texts"), the level of which will be determined in discovery. Her FAC was properly pleaded in compliance with Rule 8, so as to show that Plaintiff is "entitled to relief in order to give the defendant fair notice." F.R.C.P. 8(a)(2).

## II  LEGAL STANDARD

"When considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'" *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long County*, 999 F.2d 1508, 1510 (11th Cir. 1993)). In order to state a claim for relief, the Federal Rules of Civil Procedure state that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The U.S. Supreme Court explained that the purpose of the rule was to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). "Plaintiff may rest on jurisdictional allegations in the complaint unless the defendant controverts those allegations with a factual showing." *General Elec. Credit Corp. v. Scott's Furniture Warehouse Showroom, Inc.*, 699 F. Supp. 907, 910 (N.D.Ga.1988) Uncontroverted factual allegations in the complaint must be taken as true. *Id.* However, when allegations in the complaint have been controverted by evidence such as affidavits, the plaintiff must present more than conclusory statements [] to

establish personal jurisdiction. *Id.* (emphasis added.)

## III. PLAINTIFF'S RESPONSE TO DELL ARGUMENT

### A. Personal Jurisdiction of the Court over DELL Defendants and Venue under The Northern District of Alabama

DELL's MTD makes no factual showing nor does it controvert Plaintiff's FAC by presenting evidence such as affidavits. DELL's argument relies wholly upon superfluous irrelevant documents having no connection to the facts of this case, suppositions and conclusory statements. DELL attempt's to lead the Court to join in their speculation by saying, "the Court can reasonably infer" that Plaintiff received the Texts in North Carolina.[D.E. 26-1 page 9]. The *jumping conclusion bias* (also known as the inference-observation confusion) is a psychological term referring to a communication obstacle where one "judges or decides something without having all the facts; to reach unwarranted conclusions."[1] DELL"s fatal argument is predicated on their speculation that Plaintiff was domiciled in North Carolina ("NC") and, therefore, she "received the allegedly unsolicited text messages on her Tracfone primarily in North Carolina." *Id.* (emphasis added) This is most certainly not the case. The Texts were received in more than one judicial district. (See Affidavit in Support of Plaintiff's Response in Opposition to Motions

---

[1] See Hamilton, Cheryl (2011). Communicating for Results: A Guide for Business and the Professions. p. 162. ISBN 978-1-4390-3643-3.

to Dismiss ("ASPRO") at ¶24, which is filed contemporaneously herewith.) The governing statute, 28 U.S.C. §1391(b)(2), requires that a *substantial part* of the Texts be received in the judicial district. Plaintiff's ASPRO evidences that, while a portion of the Texts were received in NC, a *substantial part* was indeed received within the Northern District of Alabama.

### 1. *DELL waived their right to raise any personal jurisdictional defense*

Neither DELL nor defendant General Electric Company ("GE") has raised a defense to this Court's subject-matter jurisdiction. Pursuant to Fed. R. Civ. P. 12(h)(3), DELL has waived any defense to subject-matter jurisdiction and all parties are in agreement to total diversity of parties and the amount in question exceeds $75,000. "Plaintiff may rest on jurisdictional allegations in the complaint unless the defendant controverts those allegations with a factual showing." *General Elec. Credit Corp. v. Scott's Furniture Warehouse Showroom, Inc.,* 699 F. Supp. 907, 910 (N.D.Ga.1988) Uncontroverted factual allegations in the complaint must be taken as true. *Id.* However, when allegations in the complaint have been controverted by evidence such as affidavits, the plaintiff must present more than conclusory statements [] to establish personal jurisdiction. *Id.*

Moreover, DELL has not raised a defense under Fed. R. Civ. P. 12(b)(5) herein and therefore concedes to having received proper service of process. Service of process was indeed perfected by the Clerk's office of the Northern District of

Alabama, and having thereafter voluntarily made an appearance before this court in the forum state, DELL waived the right to raise any jurisdictional defense. Furthermore, after freely making said appearance, DELL went on to deliberately make use of this specific court's procedures by filing their motion for extension of time to respond to the complaint [D.E. 13] and, in addition, their corporate disclosures. [D.E. 14] These actions served as constructive consent to the personal jurisdiction of the Northern District of Alabama. "A defendant normally . . . waives a personal jurisdiction defense if he or she has entered an appearance." *Baragona v. Kuwait Gulf Link Transp. Co.*, 594 F.3d 852, 854 (11th Cir. 2010); "[T]he voluntary use of certain [district] court procedures" serve as "constructive consent to the personal jurisdiction of the [district] court," *Compagnie des Bauxite de Guinea*, 456 U.S. at 704; "Defendants waived their lack of personal jurisdiction defense, and voluntarily submitted to the district court's jurisdiction, when their attorney entered a general appearance with the district court on their behalf." *Gerber v. Riordan*, 649 F.3d 514 (6th Cir. 2011).

DELL's MTD moves on to ramble about Plaintiff failing to allege any facts to establish specific jurisdiction over DELL and is, again, replete with additional unsupported and conclusory statements that bear no evidence in fact. Plaintiff's ASPRO attests to the fallaciousness of DELL's inferences. (See ASPRO ¶¶ 1-10 and ¶¶23-25) Conclusory statements, "although presented in the form of factual

declarations, are in substance legal conclusions that do not trigger a duty for Plaintiffs to respond with evidence of their own supporting jurisdiction." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1215 (11th Cir.1999).

In *Burger King*, the Supreme Court held: "Jurisdiction [] may not be avoided merely because the defendant did not *physically* enter the forum State. [I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there. *Keeton v. Hustler Magazine, Inc., supra,* at 465 U. S. 774-775; *see also Calder v. Jones,* 465 U.S. at 465 U. S. 788-790; *McGee v. International Life Insurance Co.,* 355 U.S. at 355 U. S. 222-223. *Cf. Hoopeston Canning Co. v. Cullen,* 318 U. S. 313, 318 U. S. 317 (1943)." In Burger King Corp. v. Rudzewicz, 471 U.S. 476 (1985)

After Plaintiff left NC at the end of July 2014, she and her cellular telephone were indisputably located within the Northern District of Alabama when a substantial part of the events or omissions giving rise to the claim occurred. (See ASPRO ¶¶ 1-10 and ¶¶23-25) Regrettably, DELL engaged in a frivolous and ill-advised exercise, while effecting a huge waste of trees, toner, postage, post office

employee labor, and the manpower of office personnel to document events that took place long before the times relevant to this case. Not a single one of DELL's exhibits present a scintilla of evidence showing either Plaintiff's physical location, nor that of her cellular telephone, as it was incessantly bombarded, during any moment relevant to this case. Had DELL taken more than a perfunctory glance at the documents they filed as exhibits with their MTD, they might have realized their error before their wasteful exercise.

2. *Venue is proper in The Northern District of Alabama*

Pursuant to 28 U.S. Code § 1391(b), which governs Venue in General:

"A civil action may be brought in—
   (1) a judicial district in which any defendant **resides**, if all defendants are residents of the State in which the district is located; **or**
   (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."

To evidence this District as proper under Venue in General, only <u>one</u> of the two requirements of §1391(b) must be met. With respect to the *first*, subsection (b)(1), Plaintiff asks the Court to examine how the statute determines where a defendant corporation <u>resides</u>. To accomplish this, §1391(**c**)(2), which, also for purposes of *venue*, holds: "an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to <u>reside</u>, if a defendant, in <u>any judicial district</u> in which such defendant is <u>subject to the court's personal jurisdiction</u> with respect to the civil action in question."

Both DELL and GE, have submitted to this court's personal jurisdiction, when they each voluntarily made their unqualified appearances: DELL on December 27, 2017 [D.E. 12] and GE on December 28, 2017 [D.E. 17 and 18], both of which were followed by multiple other filings, availing themselves of this court's procedures. The other filings were detailed and supported by *Baragona, Compagnie des Bauxite de Guinea* and *Gerber,* earlier in this PROD. Therefore, both DELL and Defendant GE have been deemed to <u>reside</u> within the Northern District of Alabama ("ND of AL").

Insofar as the *first* path has herewith been shown to sufficiently evidence the ND of AL to indeed be the proper Venue, Plaintiff will also address the *second* path. 28 U.S. Code § 1391(b)(2), provides, "a civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." A substantial part of the events giving rise to the claims in the instant case occurred in each of two different judicial districts. In Jenkins, the 11th Circuit confirmed that 28 U.S.C. § 1391(a)(2), (allowing for venue in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred") contemplates some cases in which venue will be proper in two or more districts. The statute's language is instructive: venue is proper in "a judicial district in which a *substantial* part of the *events or omissions giving rise to the claim occurred.*" 28 U.S.C. § 1391(a)(2) (emphasis added) *Jenkins v. Bremer,* 321

F.3d 1366 (11th Cir. 2003); In some cases, venue will be proper in more than one district. *Id.* 1371.

"[V]enue may be proper in any of a number of districts, provided <u>only</u> that a substantial part of the events giving rise to the claim occurred there. *SE Property Holdings v. Swindall*, Civ Action: 12-0412-CG-M, (S.D. Ala. Aug. 23, 2012). (emphasis added.), See *Setco Ents. Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir.1994) (discussing similar provision in 28 U.S.C. §1391(a)(2)); The court need not determine where the defendants' activities were *most* substantial, but instead must ascertain "if substantial activities took place in Kansas related to the plaintiffs' claims. If the selected district's contacts are 'substantial,' it should make no difference that another's are more so, or the most so." *Multi-Media Intern., LLC v. Promag Retail Servs.*, 343 F. Supp. 2d 1024, 1033 (D. Kan. 2004) (emphasis in original).

When Plaintiff composed her FAC, it did not enter her mind that it was necessary to separately plead that smaller portion of the events or omissions giving rise to Plaintiff's claims that occurred other than where she is now domiciled. Plaintiff had gone to NC to allow her son to attend a school there and, while it is true she was there for several years, she never had the intention of remaining. Domicile generally requires physical presence in the state and the intent to make the state one's "'true, fixed, and permanent home and principal establishment.'"

*McCormick v. Anderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002); Acquiring a domicile entails the happening of two concurrent conditions: (1) the act of changing residence and (2) the intent to reside either permanently or for an indefinite time in the future at the new residence. *Ex Parte Bullen*, 236 Ala. 56, 181 So. 498 (1938); The act of changing residence and the intent to reside permanently or indefinitely at the new residence coalesce to form an important element that is present when a new domicile is acquired.  There must be a present intention to abandon permanently or indefinitely the former domicile. Temporary absence from one's residence without the intent to abandon completely the former domicile will not create a new domicile. *Wilkerson v. Lee*, 236 Ala. 104, 181 So. 296 (1938).

It is true that Plaintiff did live in Zebulon NC for part of the time her son was attending school in the Raleigh area. (ASPRO ¶2 and ¶6) During the first four months she received the Texts, or approximately 40% of the 10-month period in which the Texts were sent, they came to her in NC. (*Id.* ¶24)  At the end of July 2014, Plaintiff packed up her things, permanently left NC, and brought herself and her son back to her hometown in Tuscaloosa County, Alabama. ("Tuscaloosa") (*Id.* ¶¶6-7, ¶21 and ¶23)  Plaintiff's purpose for being in NC was done, as it had always been only temporary. When Plaintiff returned to Tuscaloosa, she was "coming home" and her intention was to remain there. (*Id.* ¶7)

A substantial, and the larger, part of the events giving rise to Plaintiff's claim, however, occurred after she left NC and returned to Tuscaloosa. Given that events occurred in two different states, Plaintiff had a choice between those two venues in which to bring this case. She could have chosen either the of Eastern District of North Carolina ("ED of NC") or the ND of AL. Plaintiff is currently domiciled in Tuscaloosa. As a *pro se* litigant, proximity to the clerk's office was an important factor, because electronic filing is not available. A *pro se* plaintiff must physically file all her pleadings in the office of the Clerk of Court, so the choice was between Birmingham, AL and Raleigh, NC for handling this necessity. The local forum was, of course, the more convenient venue for her.

In *Gulf Oil*, the Supreme Court opined that "the plaintiff's choice of forum should rarely be disturbed", and also, "These statutes are drawn with a necessary generality, and usually give a plaintiff a choice of courts. [U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." (Emphasis added.) [T]he defendant has a heavy burden of demonstrating that the plaintiff's choice of forum is "unnecessarily burdensome," *Piper Aircraft*, 454 U.S. at 252 n.19.

The violations in the instant case occurred in two different states and two different federal district court forums. Should the Court, based on the 40% of the time in which Plaintiff was in NC, determine the more appropriate venue to be the

ED of NC, rather than the ND of AL, then Plaintiff respectfully requests that the Court not dismiss, but pursuant to 29 U.S.C. § 1404(a), transfer her case. When the alternative forum is a federal district court, the case can be transferred to another district or division "for convenience of parties and witnesses, in the interest of justice." 29 U.S.C.§ 1404(a) (1970) While the transfer to a clerk's office that is 583 miles away would certainly make it much more difficult for the *pro se* plaintiff in this case, it should have no effect on the Defendants, other than finding attorneys licensed to practice in the ED of NC. Therefore, a transfer would not seem to be more convenient for any party and neither would it have any effect upon promoting the "interest of justice." A case can be transferred on to a district court where the original action could have been brought. (See *Hoffman v. Blaski*, 363 U.S. 335, 342-43 (1960) (venue objections cannot be waived by consent). The Supreme Court in *Van Dusen v. Barrack* held that a venue transfer sought by the defendant under 28 U.S.C. §1404(a) in a diversity case is only a change of courtrooms; therefore, the law to be applied in the case is not affected by the venue transfer. When transfer is possible, a federal court should not dismiss. See *Collins v. American Automobile Ins. Co.*, 230 F.2d 416, 418 (2nd Cir.), 352 U.S. 802 (1956).

Plaintiff has attested to her location during all times relevant to the FAC (see ASPRO) and DELL's argument has no bearing on the venue determination under

28 U.S. Code §1391(b)(2). However, Plaintiff will address DELL's reference to
the August 2105 complaint Plaintiff filed in the ED of NC. The events pled in that
particular complaint *occurred* in NC in 2012-2013; the complaint reflected that
Plaintiff resided in NC *during all relevant times* to that case; and therefore, the
proper venue for that case was indeed the ED of NC. Plaintiff was <u>not</u>, however,
domiciled in NC at the time of filing that case. [D.E. 26-1 Ex. F]  A signer of a
complaint, pursuant Fed. R. Civ. P 11(a) "must state the signer's address, e-mail
address, and telephone number."   Said Rule does not require a signer's domicile.
Plaintiff included a local mailing address through which she could be reached,
which was her oldest son's address in Wilson NC.   To further evidence Plaintiff's
location when the case was filed, the jurat on Plaintiff's Affidavit, which was filed
contemporaneously to said complaint, had been notarized in Tuscaloosa, Alabama,
on August 19, 2015. DELL argues "Plaintiff was a resident of North Carolina
*during* the relevant time period of April 1, 2014 and January 15, 2015." (emphasis
added) [D.E. 26-1 page 9]  This is partially true, but only to the extent that Plaintiff
lived in NC *during* a portion of the relevant time period. After the end of July
2014, Plaintiff left NC to move to AL, which constitutes the remainder of said
times. (ASPRO ¶6-7 and ¶23)

DELL was sloppy and careless with data and details when it declared
Plaintiff "was not a resident of this District at the time the conduct in the

Complaint allegedly occurred, and the acts giving rise to this TCPA action did not occur in this District." [D.E. 26-1 page 6]  DELL's argument fails, as it is offered to the Court after jumping to an incorrect conclusion and through inaccurate representation of the facts. DELL's MTD concludes with a final specious statement, "no events in the Complaint occurred in Alabama." [D.E. 26-1 page 17]

## B. Plaintiff's FAC Sufficiently Stated a TCPA Claim as to DELL

DELL claims Plaintiff failed to state a TCPA claim as to DELL and it can't be liable for a TCPA violation based on someone else's use of its equipment. DELL goes on to quote an FCC ruling in which it held that the application developer was not liable because it did not "make" or "initiate" the calls at issue [] but instead merely has some role, however minor, in the causal chain that results in the making of the telephone call.[] ...individuals who merely provide the technology to connect calls are not liable under the TCPA as the "maker" of the phone call." [26-1 page 15]  The EMC[2] (nka Dell EMC) publishes on its website a press release dated September 15, 2011 evidencing EMC's presence in NC[3] prior to the events or omissions giving rise to the claim occurred.  It is a highly plausible

---

[2] EMC is now Dell EMC, but during relevant times to this case was still EMC. Any reference to EMC in this PROD will mean EMC, nka Dell EMC.
[3] *EMC's New Center Of Excellence And Cloud Data Center Powers Company's Cloud Computing Vision*, September 15, 2011,
https://www.emc.com/about/news/press/2011/20110915-01.htm

scenario that a prior EMC employee or contractor, near the Durham, NC EMC

operations, with the cellular telephone number having a 919 area code which had

later been assigned to Plaintiff, could most certainly have been involved with

management of EMC data, IT asset, or server management for Defendant GE. The

press release reported:

> "EMC announced its 450,000 square foot Center of Excellence
> (COE) in Durham, North Carolina in 2011. The COE houses a
> virtualized data center. [] EMC was faced with unrelenting
> information growth; inefficient IT infrastructure utilization and
> congested, energy-exhausting data centers.
>
> **Durham Cloud Data Center At-A-Glance:**
>
> · Leverages [] information infrastructure products including:
>   EMC® Symmetrix® [] storage systems[] and Data Domain
>   backup and recovery solutions, EMC [] data warehousing []
>   technologies[,] for management and orchestration.
> · Extends EMC's private cloud to support [to include] more than
>   50,000 users; across 400 corporate offices.
>
> EMC helps IT departments to store, manage, protect and analyze
> their most valuable asset — information — in a more agile,
> trusted and cost-efficient way."

A copy of the press release is attached herewith, and marked as "**Exhibit A**".

Though the Texts carry, within the body of the messages, identifying web

addresses reflecting as having been generated from within the GE domain,

discovery will reveal the extent of EMC's involvement, if any, as related to EMC's

hands-on control, benefit derived-from, or connection-to DELL and to the EMC

elements of the Texts. Moreover, discovery will determine the level of training, or absence thereof, provided to the users by EMC that may or may not have created liability for the events pled in this case. A claim is "plausible" if the facts are sufficient "to allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009). It is necessary that a "complaint 'contain either direct or inferential allegations [] under some viable legal theory.'" *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001) (quoting *In re Plywood Antitrust Litig.*, 655 F.2d 627, 641(5th Cir. Unit A Sept. 8, 1981)). (emphasis added)

DELL's supports its claim with *Charvat*.[4] (Absent some indication that [Defendant] was somehow involved with the nineteen other calls, there is no liability attaching [Defendant] as to those calls.)" [D.E. 26-1 page 16]  The cited case in no way relates to the facts alleged in the instant action. *Charvat* involved 67 telemarketing phone calls placed on the behalf of Discover with certain quantities of the calls divided over the 4 different telemarketing firms. The *Charvat* calls were placed from recognizable telephone numbers, which would reveal the number from which the call originated. The Sender ID of a text message is not a telephone number. An SMS text message can be sent from an internet or other web

---

[4] *Charvat v. DFS Servs. LLC*, 781 F. Supp. 2d 588, 592-593 (S.D. Ohio 2011)

or cloud-based origin with no telephone number associated to its source. A text message is a wholly different communication mode than a telemarketing phone call. DELL's MTD alleges they were named in this case because Plaintiff alleges they were responsible for sending some identifiable number of the Texts and GE for the remainder, or that EMC sent the Texts on behalf of GE. Neither allegation is correct.

Plaintiff finds it disingenuous that DELL asserts that the "Sender IDs of the Texts do not reveal any identifying information." [26-1 page 16]  The Sender ID is not the identifying feature of the subject technical Texts. The Sender ID in these text message batches served as a sequential numbering system, which enumerated each batch of Texts sent, in essence keeping a count of the batches. Quite to the contrary of DELL's assertion, Plaintiff's FAC is most definitely not "Absent some indications that" EMC "was somehow involved." The FAC clearly divulges the content inside each batch of messages as containing at least three different "indications" that implicate EMC (nka DELL) in every batch of text messages Plaintiff received. Those "indications" are: "FRM: EMC CONTROL CENTER...", "Agent Name: Agent for Symmetrix", "SUBJ:ECC Alert: SRDF/A session has entered transmit idle state."  Each of these is a trademarked name, which belongs to EMC, now DELL. This is absolutely "some indication that" EMC or DELL "was somehow involved" with the Texts. DELL cites an FCC statement that an

"application developer was not liable because it did not "make" or "initiate" the calls." [D.E. 26-1 at page 14]  But, without discovery, Plaintiff cannot know if EMC, in its dealings with GE, was indeed nothing more than an "application developer."  It is simply too early in the case to discern this fact.

DELL's MTD claims that Plaintiff failed to alleged all the elements of a TCPA claim because the FAC "does not establish that any Defendant, and particularly the Dell Defendants, made any call or text message that Plaintiff received." The FCC held, "We conclude that the equipment used to originate Internet-to-phone text messages to wireless numbers via email or via a wireless carrier's web portal is an "automatic telephone dialing system" as defined in the TCPA." (emphasis added.) "Internet-to-phone messaging technology [] meets the second element of the TCPA's autodialer definition." *FCC 2015 Declaratory Ruling*, FCC 15-72, Page 8019, ¶112. Plaintiff's FAC clearly stated that the Texts carried incriminating content that suggested both GE and EMC within each batch of messages sent to her cellular telephone. At this stage of the case, there is no requirement for Plaintiff's FAC to establish which of the Defendants holds the most blame. Since the content of the Texts displayed as FRM: (from) both "EMC" and "ge.com" clearly presenting that, either separately or together, GE or EMC (nka DELL) or both were responsible for sending the Texts to Plaintiff. Discovery will reveal this information. "Fed. R. Civ. P. 8(a)(2) requires that a pleading

contain a short and plain statement of the claim showing that the pleader is entitled

to relief in order to give the defendant fair notice of what the claim is and the

grounds upon which it rests." *American Dental Ass'n v. Cigna Corp.,* 605 F.3d

1283, 1288 (11th Cir. 2010) (internal citations and quotations omitted); A

complaint must "allege facts that give rise to a plausible entitlement to relief." *Bell*

*Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662

(2009)). The *Twombly* Court stated that its new plausibility standard merely "calls

for enough fact to raise a reasonable expectation that discovery will reveal

evidence." *Id.* 550 U.S. at 556; "[W]hen a complaint adequately states a *claim,* it

may not be dismissed based on a district court's assessment that the plaintiff will

fail to find evidentiary support for his allegations or prove his *claim* to the

satisfaction of the factfinder." *Id,* 550 U.S. at 563 n. 8. Therefore, the complaint

need not allege detailed facts, *Pisciotta v. Old Nat'l Bancorp,* 499 F.3d 629, 633

(7th Cir. 2007); likewise, "a  complaint need not spell out every element of a legal

theory' to provide notice." *Scott v. City of Chi.,* 195 F.3d 950, 951 (7th Cir. 1999)

(quoting *Hemenway v. Peabody Coal Co.,* 159 F.3d 255, 261 (7th Cir. 1998)).

Discovery will determine the extent to which DELL was connected to the

events, whether through: 1) management of the subject asset(s)[5] that caused the

---

[5] An "asset" in information technology terms refers to "all elements of software and hardware
that are found in the business environment."  The GE Incident Coordinator told Plaintiff in an

Texts to be sent to Plaintiff; 2) their level of involvement through hands-on control; 3) any benefit(s) derived from the alerts; or 4) management of those who sent the alerts. Even if it is determined that it was solely GE who sent the alerts and messages to Plaintiff from within the GE domain, discovery will reveal the level of training, or absence of training, provided to the users by EMC, which may or may not have created liability for the events pled in this case. Until Discovery is performed, it is crucial that DELL remains as a defendant in this case.

### C. Plaintiff's FAC alleged facts sufficient to state a claim of conversion

DELL argues Plaintiff's failed to allege facts sufficient to state a claim for conversion and that her claim must be dismissed with prejudice. Dismissing her claim before being allowed discovery and depriving her of the right to be heard at a trial would most certainly be injurious to Plaintiff rights. These Texts were not just a few little intermittent SMS messages. The barrages of incoming Texts to Plaintiff were voluminous and uncontrollable. In *Precision IBC, Inc.,* "intent required is not necessarily a matter of conscious wrongdoing, It is rather to exercise dominion or control over the goods [of the plaintiff] which is in fact inconsistent with the plaintiff's rights." *Precision IBC, Inc. v. Wagner Ink, Inc.*, No. 12-671, 2013 WL 172563, at *n. 8 (quoting *Industrial Techs., Inc. v. Jacobs Bank*, 872 So. 2d 819 (Ala. 2003)) DELL claims "it did not take ownership or possession over any of

email on July 8, 2014 that he had "identified" the "asset" and had "reached out the team" responsible.

Plaintiff's property." Plaintiff begs to differ with this statement. The Defendants

perpetrated tortious conversion on Plaintiff's personal property and seized her right

to the use of her telephone equipment and its integral data storage. This was

especially true after GE had full knowledge as to what they were doing to her

cellular telephone and her text message inbox on June 5, 2014. Plaintiff's

communication to GE read:

> *"URGENT!! Getting HUNDREDS of text messages meant*
> *for your server SECURITY !!! Need your response*
> *IMMMEDATELY! ...* Symantec verified that you are the
> source of these messages. ... My cell phone text inbox is full,
> and each one I delete, another drops in to replace it. My
> messages say scores of additional text messages are waiting!
> Please respond ASAP."

(See ASPRO ¶¶16-17)  Plaintiff attached to her ASPRO, filed contemporaneously

herewith, photographs of just two of the scores of alerts Plaintiff's cellular

telephone gave her when Defendants persisted in commandeering her property

with the invading, energy-draining, space-taking Texts being sent to her. As

Plaintiff communicated to GE, her text inbox kept filling to capacity and each time

she deleted a text message, another new text would drop into its place, filling it

again. Her cell phone alerts told Plaintiff there were scores of text messages in a

holding pattern, as her inbox could receive no more. Because her text message box

was full, she could also not receive messages from any other source. Plaintiff

received many, many more alerts such as the two examples that follow, but she has attached images of just two of the ones she received, which stated:

"*86 New Messages. Text Message box over 100% full*"

"*Text message box full. Delete old messages*"

(See ASPRO ¶¶27-28 and ASPRO **Exhibit AA**) The Texts were taking control, using and misusing Plaintiff's personal property in the form of: depleting and wearing down her battery life; commandeering her ability to use her own equipment; seizing her integral data storage; using and wasting her purchased power to charge her battery; misusing her phone equipment through wear and tear on the life of her telephone.

The *Precision IBC, Inc.* definition of conversion most emphatically applied to what the defendants were perpetrating upon Plaintiff after they continued, with knowledge, and did nothing to stop its conversion for seven (7) months, thereafter. Plaintiff has copies of the communications between Plaintiff and GE over that 3-month period, which evidence that the defendants were knowingly and wrongfully taking, detaining, interfering with and misusing Plaintiff's property after that date.

In regard to where the Defendants' Texts took control of Plaintiff's personal property and where the Defendants' actual conversion activity took place, it is incontrovertible that Plaintiff and her cellular telephone were indeed in Alabama when a large portion of the Defendants' tortious conduct was perpetrated. "[T]he

legal injury occasioned by the tort of conversion is deemed to occur where the actual conversion takes place." *Power Beverage LLC v. Side Pocket Foods Co.*, C/A No. 06:12–931–TMC, 2013 WL 227875, at *6 (D.S.C. Jan. 22, 2013); It is the act of conversion itself that gives a right of action, and not the intent to convert," *Carolina Cas. Ins. Co. v. Tisdale*, 46 Ala. App. 50, 56, 237 So.2d 855, 860 (Civ.), 286 Ala. 741, 237 So.2d 861 (1970)" (emphasis added)  Pursuant to the applicable statutes, the Defendants actions violated the TCPA when they sent calls, in the form of text messages, to Plaintiff's cellular telephone number. The Defendants committed tortuous conversion when and where they took physical control and manifested dominion over her personal property, which included her battery life, cellular telephone equipment, her data storage, her purchased energy to charge her equipment, and her text message inbox. After June 5, 2014, this was done knowingly and willingly.

## IV. CONCLUSION

Plaintiff respectfully requests that the Court take notice of the well-pleaded allegations in her first amended complaint, which this Court must accept as true at this juncture of the proceedings, and which, in light of the Plaintiff's *pro se* status, the Court must hold to a less stringent standard than formal pleadings drafted by an attorney and construe liberally. See *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct.

594, 596, 30 L.Ed. 2d 652 (1972). Plaintiff has pleaded facts sufficient to allow a court, drawing on "judicial experience and common sense," to infer "more than the mere possibility of misconduct", which easily satisfies her burden of pleading, at this stage, under the statutes. See *Ashcroft v. Iqbal*, 129 S. Ct. at 1950. Plaintiff's claims should therefore survive dismissal.

In the Courts consideration of the merits of both DELL's MTD and this response, Plaintiff begs the Court to consider that DELL possessed the advantage of over 40 days leisure, plus the benefits of a full legal and clerical staff, in the composition of their MTD. While in contrast, Plaintiff was served the task of simultaneously researching, supporting, composing and filing two separate responses to motions to dismiss, absent assistance of paralegals or staff, as a lone individual *pro se* party in only 14 days. Plaintiff prays the Court will excuse any errors she may herein have inadvertently committed in composing and presenting her response to DELL's MTD.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order denying Defendant DELL TECHNOLOGIES, INC., DELL, INC., and DELL EMC'S Motion to Dismiss the Complaint [D.E. 26] as Defendants' arguments are meritless. In the alternative, under Rule 15(a)(2) and/or Rule 21, Plaintiff asks that the Court grant her leave amend her First Amended Complaint [D.E. 4] to correct

any deficiencies therein.   Also in the alternative, should the Court decide that the

Northern District of Alabama is not the proper venue for Plaintiff case, then

Plaintiff respectfully requests that the Court not dismiss, but pursuant to 29 U.S.C.

§ 1404(a), transfer her case to the appropriate venue.


This the ____ day of January 2018.


Future notice to:                                    Marian Snow
is to be made at the following address:              4336 Ridgewood Road
                                                     Tuscaloosa, AL  35404
                                                     (919) 449-4908
                                                     msnow20@gmail.com

# Exhibit A

EMC Press Release:

*EMC's New Center Of Excellence And Cloud Data Center Powers Company's Cloud Computing Vision*
September 15, 2011

https://www.emc.com/about/news/press/2011/20110915-01.htm



## EMC

SHARE

# Press Release

## EMC's New Center Of Excellence And Cloud Data Center Powers Company's Cloud Computing Vision

New Center of Excellence Houses a R&D Lab Facility and State-of-the-Art Data Center to Deliver and Showcase World-Class Cloud Computing Capabilities for EMC and its Customers

**Tweet**  **Recommend**  **Share** Be the first of your friends to recommend this.

**HOPKINTON, MASS., SEPTEMBER 15, 2011 - News Summary:**

- As the first U.S.-based and seventh global EMC Center of Excellence (COE), the new 450,000 square foot Durham, North Carolina facility will house the company's state-of-the-art cloud data center and 130,000 square feet of labs to support EMC's global research and development community

- EMC's new cloud data center powers the EMC IT organization's world-class cloud computing capabilities and accelerates the company towards pervasive cloud computing and virtualization

- Data center design provides the scalable foundation for cloud computing and delivering IT as a Service (ITaaS) to EMC's more than 50,000 employees

- Runs mission critical applications that support EMC's business throughout the globe

- Incorporates sustainability and energy-efficiency in design and construction

- Provides a live cloud computing technology showcase, "cloud demo" proof-of-concept capabilities and best practices for EMC customers through the EMC IT Proven program

- EMC Durham facility is the seventh global EMC Center of Excellence (COE), which are located in the United States, India, China, Egypt, Israel, Ireland and Russia

**Full Story:**

EMC Corporation (NYSE: EMC) today announced its new 450,000 square foot Center of Excellence (COE) in Durham, North Carolina, which will deliver on and demonstrate the promise of cloud computing and IT as a Service (ITaaS) for EMC and its customers. In addition to housing a highly-virtualized cloud data center that supports EMC's more than 50,000 employees around the globe, the COE includes 130,000 square feet of global research and development labs and will be a technology showcase to help EMC customers accelerate their own cloud computing and IT transformations.

EMC's facility in Durham is the latest facility in the company's global network of COEs, which are located in India, China, Egypt, Israel, Ireland, and Russia. The Centers of Excellence perform essential services for EMC business units, including engineering and research and development, customer service, translation services, IT and technical support, and customer executive briefings.

**New Data Center Accelerates EMC's Own Journey to Cloud Computing**

Like many organizations, EMC was faced with unrelenting information growth, inefficient IT infrastructure utilization, increasingly complex application environments, and congested, energy-exhausting data centers. In response, in 2004, EMC's IT organization began moving from a physical to a highly-virtualized IT infrastructure and embarking on what would become its multi-year cloud computing strategy to transform how IT is delivered and consumed through ITaaS. To accelerate this transformation, the company built a new, energy-efficient cloud data center in Durham, North Carolina.

Well on its way to pervasive virtualization, the new EMC data center provides the foundation required for cloud computing with an architecture that will leverage EMC's latest information infrastructure technologies, VMware virtualization and cloud infrastructure technologies, and Vblock™ Infrastructure Platforms from VCE, the Virtual Computing Environment Company formed by Cisco and EMC with investments from VMware and Intel.

Through the EMC IT Proven program, which chronicles and shares IT and cloud computing best practices, the new data center will also serve as a technology showcase for EMC's customers. The company will hold customer briefings and tours of its new Durham data center to share best practices and demonstrate firsthand how EMC, VMware, VCE and other partner technologies can help accelerate their own IT transformations.

**Durham Cloud Data Center At-A-Glance:**

- Designed to operate as a Tier III data center with N+1 redundancy and redundant pathways for the highest availability supporting mission critical operations

- Leverages EMC's broad portfolio of information infrastructure products including: EMC® Symmetrix® VMAX™ storage systems, EMC VPLEX™ and EMC VNX™ platforms, EMC Avamar® and Data Domain backup and recovery solutions, EMC Greenplum solutions for data warehousing and Big Data analytics, EMC RSA® security technologies, EMC Documentum® ECM solutions, and Ionix™ for management and orchestration

- In addition to hosting applications on a shared, tiered virtual infrastructure, the new data center will run on a single version of the VMware vSphere® virtualization and cloud infrastructure platform within an x86 enterprise hosting architecture running on Vblock Infrastructure Platforms from VCE. About 350 applications and six petabytes (6 PB) of data will be hosted at the center.

**Additional Information**

**Subscriptions**

EMC E-News (e-mail alerts)

Newsletters and Other
Publications

**Web Feeds**

RSS

Podcasts

Blogs

New Events Calendar

- Incorporates sustainability and energy efficiency, including a rooftop water collection system, free air cooling for much of the year, and flywheel technology that eliminates the need for battery storage in the uninterrupted power supply systems.

- Extends EMC's private cloud to support the company's global footprint of more than 50,000 users, across 400 corporate offices, in more than 80 countries and federating its cloud across the globe in four continents spanning five data centers.

- Enables EMC to provide "cloud demo" proof of concept capabilities for customers.

**Industry Analyst Quote**

- *Charles King, Principal Analyst, Pund-IT, Inc.*

"While building a new data center from the ground can be daunting, it is also offers a company the opportunity to rethink and even reinvent how IT will support and deliver solutions to the business. As a leading global technology innovator, EMC has put its money where its mouth is with its new COE and cloud data center. By doing so, the company has opened the doors to harness the agility of cloud computing for its employees. Its efforts should also help EMC customers develop their own virtualization and cloud computing initiatives."

**EMC Executive Quote**

- *Sanjay Mirchandani, EMC Chief Information Officer and COO, Global Centers of Excellence*

"We are pleased to extend EMC's network of COEs around the globe by increasing our IT and R&D presence in North Carolina. Our virtual-first mantra and the latest EMC, VMware and VCE technologies, not only provided the foundation to deliver agility to our more than 50,000 employees, but the COE, data center and our R&D labs enable us to extend and showcase our world-class cloud computing capabilities, solutions and the best practices with our customers."

**Additional Resources:**

- Video – Durham Data Center: Powering EMC's Cloud Vision

- Whitepaper – EMC IT's Journey to the Cloud: A practitioner's guide

- Strategy Brief – Durham: Powering EMC's Cloud Vision

- Strategy Brief – Durham: Energy Efficient Design and Construction

- EMC IT Proven website

- EMC IT's Blog

- Connect with EMC via Twitter, Facebook, YouTube, LinkedIn and ECN

**ABOUT EMC**

EMC Corporation is a global leader in enabling businesses and service providers to transform their operations and deliver IT as a service. Fundamental to this transformation is cloud computing. Through innovative products and services, EMC accelerates the journey to cloud computing, helping IT departments to store, manage, protect and analyze their most valuable asset — information — in a more agile, trusted and cost-efficient way. Additional information about EMC can be found at www.EMC.com.

**PRESS CONTACTS**

Lesley Ogrodnick
(508) 293-6951
lesley.ogrodnick@emc.com

DELL Technologies

United States

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the undersigned date, the original of

the foregoing was filed with the Clerk of Court and served by mail on anyone unable

to accept the resulting said electronic filing by the Clerk of Court. Notice of this

filing will be sent by e-mail to all parties by operation of the Court's electronic filing

system or by postage-prepaid first-class mail or Priority Mail to anyone unable to

accept electronic filing. Parties may access this filing through the Court's CM/ECF

System.

> Wes Gilchrist
> Brooke G. Malcom
> Jeffrey P. Doss
> LIGHTFOOT, FRANKLIN & WHITE LLC
> 400 20th Street North
> Birmingham, Alabama 35203-3200
> *Counsel for General Electric Company*
>
> Derin B. Dickerson, Alston & Bird, LLP *(pro hac vice)*
> Cassie Johnson, Alston & Bird, LLP *(pro hac vice)*
> Adam P. Plant
> Battle & Winn, LLP
> 2901 2nd Avenue South, Suite 220
> Birmingham, AL  35233
> *Counsel for Dell, Inc., Dell EMC and Dell Technologies, Inc.*

This _31st_ day of January 2018

Marian Snow
4336 Ridgewood Road
Tuscaloosa, AL  35404
(919) 449-4908
msnow20@gmail.com